UNITED STATES DISTRICT COURT
SOUTHERN  DISTRICT OF NEW YORK

------------------------------------------------ X

RAMONA DE LA ROSA,

                    Plaintiff,

            - against -

THE CITY OF NEW YORK POLICE
DEPARTMENT AND THE CITY OF
NEW YORK,

                 Defendants.

------------------------------------------------ X

**OPINION AND ORDER**

**09 Civ. 5290 (SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

         Ramona De La Rosa, a former Police Administrative Aide ("PAA")

with the New York City Police Department ("NYPD"), proceeding pro se, brings

suit against the NYPD and the City of New York (collectively, "Defendants"),

alleging failure to accommodate her disability, discrimination, retaliation, and a

hostile work environment under the Americans with Disabilities Act of 1990

("ADA").[1]  Defendants move for summary judgment with respect to all claims.

For the reasons set forth below, Defendants' motion is granted in full.

---

[1]     *See* 42 U.S.C. § 12112 *et seq.*

1

## II.   BACKGROUND[2]

De La Rosa suffers from degenerative disc disorder, arthritis in her

knees, and herniated discs in her neck and back.[3]  These conditions affect her

---

[2]      Local Civil Rule 56.1(a) requires a party moving for summary judgment to "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Rule 56.1(b) requires the party opposing summary judgment to respond to the movant's statement with a correspondingly numbered statement.  "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  Rule 56.1(c).  If the non-moving party controverts any statement, the non-moving party must cite to evidence that would be admissible at trial that shows that the controverted statement is in fact in dispute.  *See* Rule 56.1(d); *see also Rodriguez v. Schneider*, No. 95 Civ. 4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999).  Although De La Rosa's response to Defendants' 56.1 statement contains correspondingly numbered paragraphs, De La Rosa does not, with the exceptions of paragraphs 40, 43, 49-50, 60-62, 66, 76, and 83, identify any evidence in the record, or any evidence at all, to support her contention that certain facts are disputed.  *See* Plaintiff's 56.1(b) Statement ("Pl. 56.1").  Further, many of De La Rosa's response paragraphs either do not specifically dispute Defendants' statements or consist of "conclusory allegations, speculation or conjecture."  *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996).  Accordingly, I deem Defendants' 56.1 statement admitted by De La Rosa, except insofar as De La Rosa disputes statements made in paragraphs 40, 43, 49-50, 60-62, 66, 76, and 83.  Nevertheless, in light of the more lenient standards applied to the pleadings of pro se litigants, *see Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (per curiam), I consider De La Rosa's disputed statements to the extent that they might be material to the outcome of this motion.

[3]      *See* 4/29/10 Deposition of Ramona De La Rosa ("De La Rosa Dep."), Exs. D-H to 6/28/10 Declaration of Devor Deland Perry, counsel to Defendants, in Support of Defendants' Motion for Summary Judgment ("Perry Decl."), at 193:18-194:13.

ability to walk and to stand.[4]

## A.   Employment History and Reasonable Accommodation Requests

De La Rosa began as a civilian employee with the NYPD on July 10, 2002.[5] On November 5 of that year, De La Rosa took an unpaid medical leave of absence.[6] While on leave, she requested an assignment upon return that would not involve standing for long periods of time or climbing stairs.[7] The NYPD's Office of Equal Employment Opportunity ("OEEO") responded to her request for accommodation by offering De La Rosa a position in the 48th Precinct in the Bronx.[8] A resident of the borough, De La Rosa explained that she could not work there as she did not want her family or friends knowing about her employment with the NYPD.[9] De La Rosa further advised that she could not travel to the 48th Precinct as the length of the trip on public transportation required her to stand for

---

[4]     *See id.* at 194:15-23 ("Basically, I can't sit or stand."); *id.* at 203:4-13 ("I can't stand for a long time. I can't sit for a long time."); *id.* at 204:11-18 ("I can't go places that requires [sic] walking.").

[5]     *See* 6/16/04 Personnel Profile of Ramona De La Rosa ("Profile"), Ex. B to Perry Decl., at 1-2.

[6]     *See id.* at 2.

[7]     *See* 2/20/03 Request for Reasonable Accommodation for New York City Police Department Employees ("First Request"), Ex. G to Perry Decl., at 1.

[8]     *See* 2/28/03 Investigating Officer's Report, Ex. G to Perry Decl.

[9]     *See id.*

3

too long.[10]  In response, the OEEO offered her two additional choices, the 40th or

44th Precincts.[11]

De La Rosa resumed active duty on March 17, 2003, returning to

medical leave two days later on March 19.[12]  During this time, the OEEO and De

La Rosa continued to discuss her reassignment location options.[13]  In response to

her concerns regarding public transportation, the OEEO offered her information on

the Access-a-Ride program, to which De La Rosa also objected.[14]  Finally, the

OEEO assigned De La Rosa to the 44th Precinct, informing her that her request for

accommodation to a location that would not require climbing stairs or standing for

long periods of time was deemed granted.[15]

---

[10]     See 3/12/03 Investigating Officer's Report, Ex. G to Perry Decl.

[11]     See id.; 3/18/03 Investigating Officer's Report ("3/18/03 Report"), Ex.
G to Perry Decl.

[12]     See Profile at 2-3.

[13]     See 3/18/03 Report.

[14]     See id.  De La Rosa later explained to the OEEO that the Access-a-
Ride program caused her back pain. See 5/22/03 Letter from Ramona De La Rosa
to Neldra M. Zeigler ("5/22/03 Letter"), Ex. P-351 to Declaration of Ramona De
La Rosa in Opposition to Defendants' Motion for Summary Judgment ("De La
Rosa Decl.").

[15]     See 3/25/03 Letter from Neldra M. Zeigler to Ramona De La Rosa,
Ex. G to Perry Decl.; 5/16/03 Letter from Neldra M. Zeigler to Ramona De La
Rosa ("5/16/03 Letter"), Ex. H to Perry Decl.

4

Following her reassignment to the 44th Precinct, De La Rosa and the NYPD continued to correspond regarding her accommodation request.[16] In these letters, De La Rosa repeated her objections to the three precincts for the reasons she had previously articulated—the length of the commute on public transportation and the location near her home.[17] In response, the OEEO explained that her assignment to the 44th Precinct, a location accessible by public transportation and offering either an elevator or no stairs, responded to her request.[18]

During this second medical leave, De La Rosa made an additional OEEO request for a chair with lumbar support.[19] The OEEO approved the request for the chair on November 21, 2003.[20] De La Rosa's second medical leave lasted until December 16, 2003 when she reported to the 44th Precinct.[21] She immediately

---

[16] *See* 5/16/03 Letter; 5/22/03 Letter; 5/25/03 Letter from Ramona De La Rosa to Raymond W. Kelly ("5/25/03 Letter"), Ex. H to Perry Decl.; 7/8/03 Letter from Neldra M. Zeigler to Ramona De La Rosa ("7/8/03 Letter"), Ex. H to Perry Decl.

[17] *See* 5/22/03 Letter; 5/25/03 Letter.

[18] *See* 5/16/03 Letter; 7/8/03 Letter.

[19] *See* 11/6/03 Office of Equal Employment Opportunity Reasonable Accommodation Request Report ("Second Request"), Ex. H to Perry Decl.

[20] *See id.*

[21] *See* Profile at 2-3.

5

requested a transfer from the precinct due to safety concerns,[22] and on January 8,

2004, the NYPD reassigned De La Rosa to Transit District 11 ("TD-11").[23]  De La

Rosa received the requested chair with lumbar support at this location on January

28, 2004.[24]

        On March 2, 2004, De La Rosa submitted a third request for

reasonable accommodation:  to remain stationary throughout the day.[25]  This

request occurred at the same time as a scheduled meeting with her supervisor,

Yvette Santiago, regarding her first performance evaluation.[26]  According to De La

Rosa, the performance evaluation meeting was then rescheduled to include more

---

[22]     *See* 12/15/03 Memorandum from Ramona De La Rosa to Commanding Officer, Ex. P-20 to De La Rosa Decl.

[23]     *See* Profile at 2-3.

[24]     *See* 12/1/03 Letter from Commanding Officer, 44th Precinct to Deputy Commissioner, Equal Employment Opportunity, Ex. H to Perry Decl.; 3/2/04 Request for Reasonable Accommodation for New York City Police Department Employees ("Third Request"), Ex. H to Perry Decl., at 2.

[25]     *See* Third Request at 1-2; *see also* 2/11/04 Letter from Harvey Insler, M.D. ("2/11/04 Letter"), Ex. P-24 to De La Rosa Decl. (stating De La Rosa must remain stationary to avoid health complications); 3/1/04 Letter from Harvey Insler, M.D. ("3/1/04 Letter"), Ex. P-31 to De La Rosa Decl. (same).

[26]     *See* 3/6/04 Letter from Ramona De La Rosa to Janine Thomas, Union Grievance Representative ("3/6/04 Letter"), Ex. P-36-37 to De La Rosa Decl. at 1-2.

senior personnel.[27]  At the meeting, De La Rosa's supervisors discussed her problems with arriving to work on time and removed her from the Flextime program.[28]

Santiago initially denied De La Rosa's third request to remain stationary, explaining that "[De La Rosa] is currently assigned to the 124 Rm in a stationary capacity."[29]  In response, De La Rosa informed OEEO that her main concern with her posting at TD-11, where she wished to remain, was "not standing for long periods of time" because "most of her duties require standing."[30]  Later,

---

[27]    *See id.* at 2.

[28]    *See* 3/2/04 Memorandum from Commanding Officer, Transit Bureau Dist #11 to Deputy Director, Civilianization/Staff Development re Deletion from Flextime Program ("3/2/04 Memorandum"), Ex. H to Perry Decl.  The NYPD noted that De La Rosa's removal from the Flextime Program was "due to her excessive pattern of tardiness eleven (11) times in two months." 5/19/04 Memorandum from Captain Warner S. Frye, Commanding Officer, Transit Bureau District 11 to Director, Employee Management Division re Recommendation for Termination of Probationary P.A.A. Ramona De La Rosa ("5/19/04 Termination Recommendation"), Ex. K to Perry Decl. at 1. *But see* 3/6/04 Letter at 2 ("My lateness was never an issue until I handed over the EEOC reasonable accommodation form.").

[29]    Third Request at 2.  Santiago further noted that De La Rosa's job required her to "mov[e] her swivel chair with wheels six (6) feet to another desk to use the PC" and make copies "in an office approx. 15 ft. from her desk." *Id.*

[30]    3/9/04 Investigating Officer's Report, Ex. H to Perry Decl.  The Investigating Officer noted that De La Rosa also mentioned "many concerns regarding her assignment at Transit District 11," suggesting transfer to another command as a possible solution. *Id.*  OEEO instructed her to have a full medical

7

the parties compromised by allowing De La Rosa to perform any work activity requiring walking or standing between 3:30-5:30 pm, a proposal with which De La Rosa agreed.[31]  This accommodation also addressed De La Rosa's request for Flextime by moving the start of her tour back from 9:00 a.m. to 9:30 a.m.[32]

On March 24, 2004, De La Rosa filed a complaint with the OEEO, alleging she had endured disparaging remarks regarding her disability at TD-11 and retaliation in connection with the March 2 meeting, where she had presented her third accommodation request.[33]  In her complaint, De La Rosa alleged that her removal from Flextime was in response to her request for reasonable accommodation.[34]  In addition, she reported that Santiago called her a "make believe handicap" and suggested that she apply for disability if she could not

---

evaluation before more comprehensive accommodations would be discussed. *See id.*

[31]    *See* 3/18/04 Investigating Officer's Report, Ex. H to Perry Decl. ("I/O conferred with PAA Delarosa, who agreed with the aforementioned proposal."); 3/29/04 Memorandum from Deputy Commissioner, Equal Employment Opportunity to Commanding Officer, Transit District 11 re Request for Reasonable Accommodation ("3/29/04 Memorandum"), Ex. H to Perry Decl.; 3/29/04 Letter from Neldra M. Zeigler to Ramona De La Rosa ("3/29/04 Letter"), Ex. H to Perry Decl.

[32]    *See* 3/29/04 Memorandum; 3/29/04 Letter.

[33]    *See* 3/24/04 Office of Equal Employment Opportunity Case Report ("3/24/04 OEEO Report"), Ex. K to Perry Decl. at 1.

[34]    *See id.* at 2.

perform her job functions.[35]  The OEEO later exonerated Santiago on both

allegations.[36]

### B.    Disciplinary Actions

While De La Rosa and the OEEO were negotiating her request to

remain stationary, she told TD-11 she would not be reporting for her scheduled

tour on March 19, 2004.[37]  To grant an Emergency Excusal Day, De La Rosa had

to provide a reason for the proposed absence, which she refused to give, explaining

only that it was for personal reasons.[38]  In response, Lieutenant Gonzalez ordered

De La Rosa to report to work to avoid being documented Absent Without Leave

("AWOL").[39]  De La Rosa did not report for duty, and she was later punished for

being AWOL.[40]

---

[35]    *See id.*

[36]    *See*  9/1/04 Report of Investigation Into Allegation That Principal
Administrative Associate Yvette Santiago Retaliated Against Police
Administrative Aide Ramona De La Rosa After Receiving a Reasonable
Accommodation, Both Assigned to Transit District #11 ("9/1/04 Report"), Ex. L to
Perry Decl. at 4.

[37]    *See* 3/19/04 Diary Entry prepared by Lt. Gonzalez ("3/19/04 Diary
Entry"), Ex. J to Perry Decl.

[38]    *See id.*

[39]    *See id.*

[40]    *See* 3/19/04 Report of Violation of the Rules and Procedures
("3/19/04 Report"), Ex. J to Perry Decl.; 4/23/04 Memorandum from Yvette

From March until May 2004, the NYPD documented other actions for

which De La Rosa received discipline, including her failure to sign out of roll

call,[41] insubordination,[42] early arrival to work,[43] and lateness.[44]  Additionally, De

---

Santiago to Ramona De La Rosa re G.O. 15 on A.W.O.L. of 3/19/04 ("4/23/04
Memorandum"), Ex. P-73 to De La Rosa Decl.  A Command Discipline was also
issued to De La Rosa for being "Absent Without Leave" and "Refus[al] to Comply
With an Order."  *See* 5/19/04 Termination Recommendation at 1.  De La Rosa was
the subject of a Departmental Hearing regarding the AWOL incident on May 4,
2004. *See id.* at 2.

[41]     *See* 3/9/04 Report of Violation of the Rules and Procedures ("3/9/04
Report of Violation"), Ex. J to Perry Decl. (documenting in addition three prior
occasions in February and March where De La Rosa failed to sign out of roll call).
A Command Discipline was issued in connection with these incidents. *See* 5/19/04
Termination Recommendation.

[42]     *See* 4/16/04 Report of Violation of the Rules and Procedures
("4/16/04 Report of Violation"), Ex. J to Perry Decl. (recounting an incident
reported by Santiago where De La Rosa refused to move her chair to a nearby
computer station to perform an assigned task).  A Command Discipline was also
issued after this incident for being "Insubordinate to a Civilian Supervisor."
5/19/04 Termination Recommendation at 1.

[43]     *See* 4/22/04 Memorandum from Yvette Santiago to Ramona De La
Rosa re Early Arrival to Work ("4/22/04 Early Arrival Memorandum"), Ex. J to
Perry Decl. (noting that arriving early and signing out early constitutes an
"unauthorized tour change").

[44]     *See* 5/8/04 Report of Violation of the Rules and Procedures ("5/8/04
Report of Violation"), Ex. J to Perry Decl. (documenting twelve instances of
lateness between March 6 and May 8); 6/5/04 Report of Violation of the Rules and
Procedures ("6/5/04 Report of Violation"), Ex. J to Perry Decl. (documenting eight
additional instances of lateness between May 12 and June 5).  A Command
Discipline was issued in connection with the twelve instances of lateness between

La Rosa's first performance evaluation documented seven sick days through March 8, 2004, while her second evaluation documented twelve total sick days through May 9.[45]  As part of her placement in the NYPD Performance Monitoring Program in April stemming from "poor performance, excessive absenteeism and/or tardiness, misconduct or below standard evaluation,"[46] De La Rosa acknowledged that termination might result if her absenteeism did not improve.[47]

### C.   Performance Evaluations

De La Rosa's first performance evaluation, covering the period January 8 through March 8, 2004, awarded her an overall score of "Below Standards."[48]  Santiago prepared the evaluation and described De La Rosa as lacking "professionalism, cooperation, motivation, and self-initiative" and being

---

March and May. *See* 5/19/04 Termination Recommendation at 1.

[45]     *See* 3/10/04 Performance Evaluation of Ramona De La Rosa ("3/10/04 Evaluation"), Ex. I to Perry Decl. at NYPD00516; 5/17/04 Performance Evaluation of Ramona De La Rosa ("5/17/04 Evaluation"), Ex. I to Perry Decl. at NYPD00503.

[46]     4/15/04 Notice of Placement into Performance Monitoring ("4/15/04 Performance Monitoring"), Ex. I to Perry Decl. at NYPD 00481-82.

[47]     4/15/04 Acknowledgment of Performance Monitoring, Ex. I to Perry Decl.

[48]     *See* 3/10/04 Evaluation at NYPD00516.

11

"argumentative and impudent with her supervisors."[49]  Specifically, Santiago rated
De La Rosa "Below Standards" with respect to four out of the six critical tasks for
her position:  updating files, records, and reports; performing routine clerical tasks;
answering telephone calls; and updating roll calls.[50]  Santiago also appended a list
of fourteen poor performance incidents to the evaluation.[51]

      At De La Rosa's second performance evaluation in May 2004,
covering the period March 9 through May 9, 2004, she again received a "Below
Standards" rating.[52]  Santiago noted that De La Rosa had "demonstrated no change
in her performance skills since the conference held on March 2nd."[53]  De La Rosa
"continue[d] to be argumentative" and "[did] not follow instructions as given by
her uniform supervisors."[54]  This evaluation rated her "Below Standards" in five of
the six critical tasks:  processing forms; typing reports and forms; filing records,
reports, and forms; performing routine clerical tasks; and updating roll calls.[55]

---

[49]   *Id.*

[50]   *See id.* at NYPD00517-18.

[51]   *See id.* at NYPD00520-22.

[52]   5/17/04 Evaluation at NYPD00503.

[53]   *Id.*

[54]   *Id.*

[55]   *See id.* at NYPD00504-05.

Santiago again attached a list of eight specific incidents related to De La Rosa's poor performance rating.[56]

### D.   Suspension and Termination

Following her second performance evaluation, Santiago recommended that De La Rosa be terminated because of her "negative attitude towards her work," "lack of respect for those who serve as her supervisors," "lack of cooperation when given clerical tasks to complete," and "rude demeanor."[57]  The Commanding Officer of TD-11, Captain Warner Frye, also recommended De La Rosa's termination to his superiors due to her accumulation of four Command Disciplines, two "Below Standards" performance evaluations, and her "poor attendance and job performance."[58]

The NYPD suspended De La Rosa for thirty days following an incident of insubordination on June 9, 2004.[59]  According to the incident report prepared by Captain Frye, De La Rosa refused Lieutenant Morillo's order to close

---

[56]     *See id.* at NYPD00506-08.

[57]     5/18/04 Memorandum from Yvette Santiago to Commanding Officer, TD-11 re Performance Appraisal Interview, Ex. J to Perry Decl.

[58]     5/19/04 Termination Recommendation at 1-2.

[59]     *See* 6/9/04 Report of On Duty Police Administrative Aid was Suspended as a Result of an Investigation Conducted under I.A.B. Log # 04-17272 ("6/9/04 Suspension Report"), Ex. K to Perry Decl. at NYPD00462-65.

an open complaint report at 10:30 a.m., telling him that "she ha[d] a reasonable

accommodation letter from the Office of Equal Employment Opportunity,

recommending that she is to remain at her desk until 1530 hours, barring exigent

circumstances."[60]  Lieutenant Morillo repeated his order twice, with De La Rosa

refusing to comply each time.[61]  After hearing the warning that her behavior could

result in suspension, De La Rosa replied that she did not care and the lieutenant

should "do what he had to do."[62]  The report concluded that De La Rosa was

"insubordinate and discourteous toward a supervisor" and recommended that

Charges and Specifications be filed.[63]

---

[60]     *Id.* at NYPD00462.  The report documented that the computer De La
Rosa would need to complete the task was located three feet from her desk. *See id.*
After the incident, De La Rosa made a voluntary statement to investigating officers
that she refused the lieutenant's order because of her reasonable accommodation
letter, recommending that she remain at her desk until 3:30 p.m. *See id.* at 2.  De
La Rosa repeated this explanation to the OEEO Investigating Officer during her
suspension, explaining that there was another PAA with a computer who could
have completed the task. *See* 6/15/04 Investigating Officer's Report, Ex. L to Perry
Decl.

[61]     *See* 6/9/04 Suspension Report at NYPD00462-63.

[62]     *Id.* at NYPD00463.

[63]     *Id.* at NYPD00464.  Charges and Specifications were filed on June 15.
*See* 6/15/04 Charges and Specifications against Ramona De La Rosa, Ex. K to
Perry Decl.

De La Rosa returned from her suspension on July 9, 2004.[64] On the same day, the NYPD again placed her in the Performance Monitoring Program.[65] As before, De La Rosa acknowledged that her "record of misconduct" might result in her termination.[66] The NYPD terminated De La Rosa on July 21, 2004.[67]

### E.    Retaliation and Hostile Work Environment Claims

De La Rosa cites several instances of perceived retaliatory and hostile actions at TD-11. For example, De La Rosa objected to the nature of her work at TD-11, in particular her varying duties regarding "summonses, statistics, and warrant checks" to "roll call" duties to working in the complaint room, believing it to be a greater amount of work than given to the other PAAs.[68] De La Rosa also alleged that insults about her disability affected her working environment. Specifically, she cites an instance where Santiago allegedly called her "a want to

------

[64]    *See* 7/9/04 Memorandum from Herbert G. Woods, Jr., Assistant Commissioner, to Chief of Personnel re Change in Duty Status for Member of the Service, Ex. K to Perry Decl.

[65]    *See* 7/9/04 Notice of Placement into Performance Monitoring ("7/9/04 Performance Monitoring"), Ex. J to Perry Decl. at NYPD00456-57.

[66]    7/9/04 Acknowledgment of Performance Monitoring, Ex. J to Perry Decl.

[67]    *See* 7/21/04 Termination Notice ("7/21/04 Notice"), Ex. B to Perry Decl.

[68]    De La Rosa Dep. at 113:17-114:11 ("Instead of just doing things dealing with the complaint room, I also was doing the duties of other PAAs like roll call updates and statistics and whatever duties the PAAs probably had.").

be handicapped"[69] and threatened her by saying "she wanted to take my head and kick it out in the middle of the street."[70]  Santiago denies that she made these disparaging remarks towards De La Rosa.[71]

De La Rosa also objected to other discrete instances at TD-11, including being asked to type a lieutenant's evaluation,[72] the threat of receiving a Command Discipline,[73] use of her chair by other employees,[74] damage to her chair, desk, and ID card,[75] denial of a sick day,[76] the inability to eat lunch at her desk

---

[69]     *Id.* at 116:22-23.

[70]     *Id.* at 116:17-18.

[71]     *See* 9/1/04 Report at 4.  The OEEO later deemed this allegation unfounded. *See id.* at 5.

[72]     *See* De La Rosa Dep. at 119:9-18.

[73]     *See id.* at 144:7-20.

[74]     *See id.* at 121:17-25.

[75]     *See id.* at 145:4-146:18, 148:2-12, 192:15-16; 4/22/04 Memorandum from Ramona De La Rosa to Deputy Commissioner of OEEO re Reprisal and Retaliation Needs to Stop ("4/22/04 Memorandum"), Ex. P-71-73 to De La Rosa Decl., ¶ 2.

[76]     *See* De La Rosa Dep. at 152:14-154:12l; 5/20/04 Letter from Ramona De La Rosa to Janine Thomas ("5/20/04 Letter"), Ex. P-85 to De La Rosa Decl.; 5/21/04 Memorandum from Ramona De La Rosa to Commanding Officer, TD-11 re Supervisor's Retaliation Tactics ("5/21/04 Memorandum"), Ex. P-88 to De La Rosa Decl., ¶ 1.

when other employees were allowed to do so,[77] calling her name over a

microphone while on break,[78] not being included in a coworker's retirement

party,[79] dim lighting,[80] and the general attitude towards her.[81]

### F.    Procedural History

On August 4, 2004, De La Rosa filed a formal complaint against

Defendants with the New York City Commission on Human Rights.[82]  The

Commission dismissed the complaint in August 2008, finding no probable cause

that the Defendants had discriminated against De La Rosa.[83]  The U.S. Equal

Employment Opportunity Commission ("EEOC") issued a "Dismissal and Notice

of Rights" on March 4, 2009, noting that the agency had "adopted the findings of

the state . . . agency that investigated this charge."[84]  De La Rosa initiated the

---

[77]    *See* De La Rosa Dep. at 170:16-172:11; 4/22/04 Memorandum ¶ 3.

[78]    *See* Complaint ("Compl.") ¶¶ 58-59.

[79]    *See* De La Rosa Dep. at 169:20-170:15.

[80]    *See id.* at 173:23-174:10.

[81]    *See id.* at 125:5-7, 172:14-173:22.

[82]    *See* 8/5/04 Verified Complaint, Ex. L to Perry Decl.

[83]    *See* 8/4/08 Determination and Order after Investigation, Ex. M to
Perry Decl.

[84]    3/4/09 Dismissal and Notice of Rights, Ex. M to Perry Decl.

instant action on June 8, 2009.[85]

## III.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[86] "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law.'"[87] "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[88]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. "When the burden of proof at

---

[85]     *See* Docket Sheet.

[86]     Fed. R. Civ. P. 56(c).

[87]     *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)).

[88]     *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)). *Accord Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."[89]  To counter a motion for summary judgment, the non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'"[90] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[91]  However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[92]

In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving

---

[89]     *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). *Accord In re September 11 Litig.*, No. 21 Civ. 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug. 15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.") (quotation marks omitted).

[90]     *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[91]     *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[92]     *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

party and draw all reasonable inferences" in that party's favor.[93]  However, "[i]t is

a settled rule that '[c]redibility assessments, choices between conflicting versions

of the events, and the weighing of evidence are matters for the jury, not for the

court on a motion for summary judgment.'"[94]  Summary judgment is therefore

"appropriate only if there is no genuine issue of material fact and the moving party

is entitled to judgment as a matter of law."[95]

      The submissions of a pro se party should be held "'to less stringent

standards than formal pleadings drafted by lawyers . . . .'"[96]  District courts should

"read the pleadings of a pro se plaintiff liberally and interpret them 'to raise the

strongest arguments that they suggest.'"[97]  These same principles apply to briefs

and opposition papers submitted by pro se litigants.[98]  Nonetheless, proceeding pro

---

    [93]    *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*, 477 U.S. at 247-50, 255).

    [94]    *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).  *Accord Anderson*, 477 U.S. at 249.

    [95]    *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009) (per curium).

    [96]    *Hughes*, 449 U.S. at 9 (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam)).

    [97]    *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

    [98]    *See Ortiz v. McBride*, 323 F.3d 191, 194 (2d Cir. 2003); *Burgos*, 14 F.3d at 790.

se "does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."[99]

## B.    Americans with Disabilities Act

The ADA prohibits discrimination against a "qualified" individual on the basis of disability.[100]  An individual is qualified if, with or without reasonable accommodation, she "can perform the essential functions of the employment position that such individual holds or desires."[101]

The ADA defines disability as either "a physical or mental impairment that substantially limits one or more major life activities," "a record of such impairment," or "being regarded as having such an impairment."[102]  As "[t]he ADA does not define 'impairment,' 'major life activities,' or 'substantial limitation,'"[103] the Equal Employment Opportunity Commission's ("EEOC")

---

[99]    *Cole v. Artuz*, No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

[100]    42 U.S.C. § 12112(a).

[101]    *Id.* § 12112(8).  The ADA defers to the employer's judgment of which job requirements qualify as essential functions. *See id.*

[102]    *Id.* § 12102.

[103]    *Delgado v. Triborough Bridge & Tunnel Auth.*, 485 F. Supp. 2d 453, 459 (S.D.N.Y. 2007).

administrative regulations implementing the ADA provide guidance.[104]

First, the EEOC defines a physical or mental impairment as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more . . . body systems . . . ."[105]

Next, a claimant must also demonstrate that her impairment substantially limits a major life activity.[106]  The EEOC lists major life activities as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."[107]

Finally, substantially limit means an individual is "[u]nable to perform

---

[104]     *See* 29 C.F.R. § 1630.  "We accord 'great deference' to the EEOC's interpretation of the ADA, since it is charged with administering the statute." *Francis v. City of Meriden*, 129 F.3d 281, 283 n.1 (2d Cir. 1997) (quoting *Ford v. Bernard Fineson Dev. Ctr.*, 81 F.3d 304, 309 (2d Cir. 1996)); *see also Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998) ("While these regulations are not binding, they provide us with guidance in interpreting the ADA.").

[105]     29 C.F.R. § 1630.2(h)(1); *see also Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 641 (2d Cir. 1998) (explaining that initial analysis of whether a plaintiff qualifies as disabled under the ADA queries whether she suffers from a mental or physical impairment).

[106]     *See Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002) ("Merely having an impairment does not make one disabled for purposes of ADA.").

[107]     29 C.F.R. § 1630.2(i); *see also Colwell*, 158 F.3d at 641 (noting that the second step in the ADA disability analysis identifies the limited life activity and determines whether it qualifies as major).

22

a major life activity that the average person in the general population can perform"
or "[s]ignificantly restricted as to the condition, manner or duration under which an
individual can perform a particular major life activity," compared to an average
person in the general population.[108]  Three factors aid in the consideration of
whether the impairment substantially limits a major life activity: *first*, "the nature
and severity of the impairment;" *second*, "the duration or expected duration of the
impairment;" and *third*, "the permanent or long term impact, or the expected
permanent or long term impact of or resulting from the impairment."[109]

### 1.    Failure to Accommodate

To prove failure to accommodate, a plaintiff is required to show that
"(a) plaintiff is a person with a disability under the meaning of the ADA; (b) an
employer covered by the statute had notice of h[er] disability; (c) with reasonable
accommodation, plaintiff could perform the essential functions of the job at issue;
and (d) the employer has refused to make such accommodations."[110]

"The ADA envisions an 'interactive process' by which employers and

---

[108]    29 C.F.R. §§ 1630.2(j)(1)(i)–(ii); *see also Colwell*, 158 F.3d at 641
(listing the last step in the disability determination as determining whether the
impairment substantially limits the major life activity).

[109]    29 C.F.R. §§ 1630.2(j)(2)(i)-(iii).

[110]    *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d
Cir. 2004).

employees work together to assess whether an employee's disability can be reasonably accommodated."[111] "If an employer has made reasonable efforts to communicate with an employee, or if the employee causes 'the interactive process to collapse,' an employer will not be liable for failing to make an accommodation under the ADA."[112] Moreover, an employer's reasonable accommodation does not have to be the plaintiff's requested accommodation.[113]

### 2. Disability Discrimination

The ADA creates a private right of action for disability-based employment discrimination.[114] To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (a) her employer is subject to the ADA; (b) she was a person with a disability within the meaning of the ADA; (c) she was otherwise qualified to perform the essential functions of her job, with or without

---

[111]   *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000) (citation omitted).

[112]   *Julius v. Department of Human Res. Admin.*, No. 08 Civ. 3091, 2010 WL 1253163, at *10 (S.D.N.Y. Mar. 24, 2010) (quoting *Williams v. British Airways, PLC*, Nos. 04 Civ. 0471, 06 Civ. 5085, 2007 WL 2907426, at *9 (E.D.N.Y. Sept. 27, 2007)).

[113]   *See Misek-Falkoff v. International Bus. Machs. Corp.*, 854 F. Supp. 215, 228 (S.D.N.Y. 1994) ("A plaintiff may not, however, complain successfully about the employer's choices if reasonable.").

[114]   *See* 42 U.S.C. § 12112(a).

24

reasonable accommodation; and (d) she suffered an adverse employment action because of her disability.[115]

Courts analyze claims of ADA disability discrimination using a three-part burden shifting analysis.[116]  The plaintiff has the initial burden of establishing a prima facie case of discrimination.[117]  If the plaintiff succeeds, the burden shifts to the employer to show a "legitimate, nondiscriminatory reason" for the actions.[118] If the employer can articulate such a reason, the plaintiff may show that the stated justification is pretext and that the employer intentionally discriminated against her.[119]  If the plaintiff "'make[s] a substantial showing' that the defendants' proffered explanation [i]s false, 'it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation.'"[120]

### 3.     Retaliation

---

[115]     *See Shannon v. New York City Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003).

[116]     *See Regional Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48-49 (2d Cir. 2002).

[117]     *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

[118]     *Id.*

[119]     *See id.* at 804; *Middletown*, 294 F.3d at 49.

[120]     *Middletown*, 294 F.3d at 49 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 144, 147 (2000)) (emphasis in original).

The ADA prohibits retaliation by employers directed at employees who have opposed a protected practice or filed a charge under the statute.[121] Proving retaliation requires a plaintiff to show "(1) she was engaged in an activity protected under [the ADA]; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff based upon her activity; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer."[122]  Like discrimination, retaliation claims are also subject to the *McDonnell Douglas* three-part burden-shifting analysis.[123]

A plaintiff need not show that the employer actually violated the ADA to establish her participation in a protected activity.[124]  For example, a complaint is protected activity so long as the plaintiff had a "*good faith, reasonable belief* that

---

[121]     *See* 42 U.S.C. § 12203(a).

[122]     *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993) (explaining a Title VII prima facie case).  *Accord Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) ("We analyze a retaliation claim under the ADA using the same framework employed in Title VII cases.").

[123]     *See Flynn v. New York State Div. of Parole*, 620 F. Supp. 2d 463, 488 (S.D.N.Y. 2009).

[124]     *See id.* at 489 n.31.

26

the underlying challenged actions of the employer violated the law."[125]  A request

for reasonable accommodation also constitutes protected activity for a retaliation

claim.[126]

An employer takes an adverse action against a plaintiff if the plaintiff

experiences "a 'materially adverse change' in the terms and conditions of

employment."[127]  This material adverse change must be "more than a mere

inconvenience or an alteration in job responsibilities."[128]  Indeed "'[a]n employee's

decision to report discriminatory behavior cannot immunize that employee from

those petty slights or minor annoyances that often take place at work and that all

employees experience.'"[129]  Whether an employer's action is materially adverse is

objective and should be evaluated under a reasonable person in the plaintiff's

---

[125]     *Id.* (quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d
Cir. 1998)) (emphasis in original).

[126]     *See Weixel v. Board of Educ. of N.Y.*, 287 F.3d 138, 149 (2d Cir.
2002); *Jenkins v. New York City Transit Auth.*, No. 08 Civ. 6814, 2009 WL
1940103, at *7 (S.D.N.Y. July 1, 2009).

[127]     *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.
2000) (citation omitted).

[128]     *Alvarez v. Nicholson*, No. 03 Civ. 4173, 2005 WL 1844595, at *8
(S.D.N.Y. Aug. 3, 2005).

[129]     *Flynn*, 620 F. Supp. 2d at 490 (quoting *Burlington N. & Sante Fe R.R.
Co. v. White*, 548 U.S. 53, 68 (2006)).

position standard, considering all the circumstances.[130]

Last, the causation requirement between the protected activity and the adverse change in employment status may be established indirectly by showing a short time period between the two.[131]

### 4.    Hostile Work Environment

A hostile work environment claim is evaluated under the same standard in Title VII and ADA actions.[132] "[A]n employee seeking to bring a hostile work environment claim must show that she: 1) is a member of a protected class; 2) that she suffered unwelcome harassment; 3) that she was harassed because of her membership in a protected class; and 4) that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment."[133]

The standard for a hostile work environment claim is "demanding,"

---

[130]    *See id.*

[131]    *See Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001).

[132]    *See Disanto v. McGraw-Hill, Inc./Platt's Div.*, No. 97 Civ. 1090, 1998 WL 474136, at *5 (S.D.N.Y. Aug. 10, 1998).

[133]    *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008).  The Second Circuit has not explicitly held that a hostile work environment claim is actionable under the ADA, but the district courts have so held. *See id.*

and the plaintiff must prove that the conduct was "offensive, pervasive, and continuous enough to amount to a constructive discharge."[134]  Evaluating a hostile environment involves reviewing the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[135]  The question is whether a reasonable person would have found the environment to be hostile and if the plaintiff subjectively perceived it as such.[136]  Isolated acts, unless serious, ordinarily do not meet the threshold of pervasiveness.[137]

### 5.    Statute of Limitations

Before bringing a claim in federal court, a New York plaintiff must file a charge with the EEOC within 300 days of the allegedly discriminatory action.[138]  This statutory requirement functions as a statute of limitations.[139]  A

---

[134]    *Scott v. Memorial Sloan-Kettering Cancer Ctr.*, 190 F. Supp. 2d 590, 599 (S.D.N.Y. 2002).

[135]    *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

[136]    *See Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).

[137]    *See id.*

[138]    *See* 42 U.S.C. § 12117(a) (incorporating Title VII's statutory limitations, codified at 42 U.S.C. § 200e-5(e)(1)).  As New York has its own state enforcement agency, the 300 day limitation applies instead of Title VII's general

plaintiff who fails to file a timely charge with the EEOC is generally barred from bringing a claim of discrimination in federal court,[140] unless she "come[s] forward with evidence of exceptional circumstances that would justify tolling the 300-day filing period."[141]

## IV.   DISCUSSION

### A.   First Accommodation Request

De La Rosa filed a complaint with the New York City Commission on Human Rights on August 4, 2004.  Thus, barring exceptional circumstances that would warrant tolling, any actions occurring before October 10, 2003 are time-barred.

De La Rosa made a request on February 20, 2003 to be assigned to a precinct where her job would not require standing for long periods of time or

---

180-day limitation. *See Hill v. Citibank Corp.*, 312 F. Supp. 2d 464, 472 & n.4 (S.D.N.Y. 2004).

[139]   *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996).

[140]   *Butts v. City of New York Dep't of Hous., Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993).

[141]   *Tsai v. Rockefeller Univ.*, No. 00 Civ. 329, 2002 WL 237843, at *4 (S.D.N.Y. Feb. 15, 2002).

climbing stairs.[142]  The OEEO deemed the request granted on July 8, 2003.[143]  As

she presents no evidence supporting an extension of the limitations period,[144] any

claim relating to her first request for reasonable accommodation is time-barred.

### B.   New Claims

In her 56.1 statement,[145] De La Rosa alleges two new claims:  the first

for "negligence, tort" and the second for denial of rights under "all State Human

Rights Law."[146]  Plaintiff's amended complaint alleges neither state law nor tort

law causes of action.  Because these new claims appear for the first time in

opposition papers, they will not be considered by the Court.[147]  In the alternative, if

the tort and state law claims had been pleaded in the complaint, both would be

---

[142]    *See* First Request at 1.

[143]    *See* 7/8/03 Letter.

[144]    Nor can this Court, through an independent search of the record, find
any evidence to warrant tolling.

[145]    In response to Defendants' Motion for Summary Judgment, De La
Rosa submitted only a Statement of Undisputed Facts Pursuant to Local Rule 56.1,
not a Memorandum of Law.  To the extent that the document raises legal
arguments, they will be addressed herein.

[146]    Pl. 56.1 at 1.

[147]    *See Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 170 F.R.D.
111, 119 (S.D.N.Y. 1997) ("[I]t is inappropriate to raise new claims for the first
time in submissions in opposition to summary judgment.").

31

procedurally barred.[148]

### C.   Disability

For the purposes of the failure to accommodate and discrimination claims, Defendants contend that De La Rosa does not meet the ADA's definition of an individual with a disability.[149]  Defendants concede that De La Rosa suffers from a mental or physical impairment.[150]  Defendants also agree that walking and standing are major life activities.[151]  Defendants contest that De La Rosa's osteoarthritis and herniated discs substantially limit the major life activities of walking and standing.[152]

Finding De La Rosa's walking to be substantially limited requires

---

[148]   Any discrimination claims arising under state or local law are barred by De La Rosa's election of remedies, that is her Complaint with the New York City Commission on Human Rights. *See* N.Y. Exec. Law § 297(9); N.Y.C. Admin Code §8-502(a).  Further, De La Rosa was required to file a notice of claim if she had intended to assert tort claims against Defendants. *See* N.Y. Gen. Mun. Law §§ 50-e, 50-i.

[149]   *See* Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Def. Mem.") at 3-6.

[150]   *See id.* at 3.

[151]   *See id.*

[152]   *See id.* at 4-6.

overcoming a high threshold.[153]  Moderate limitations on walking do not ordinarily

meet this threshold.[154]  Similarly, infringements on the ability to stand are not

generally considered to be substantial limitations.[155]

      De La Rosa's evidence of substantially limited ability to walk and

stand consists primarily of doctor's notes[156] and deposition testimony.  She testified

---

    [153]    *See, e.g., Elfenbein v. Bronx Lebanon Hosp. Ctr.*, No. 08 Civ. 5382, 2009 WL 3459215, at \*9 (S.D.N.Y. Oct. 27, 2009) ("'Courts have placed the bar relatively high when determining when the activity of walking has been substantially limited.'") (quoting *Potenza v. City of N.Y. Dep't of Transp.*, No. 00 Civ. 0707, 2001 WL 1267172, at \*10 (S.D.N.Y. Oct. 23, 2001), *aff'd in part*, 95 Fed. App'x 390 (2d Cir. 2004)); *Watson v. Arts & Entm't Television Network*, No. 04 Civ. 1932, 2008 WL 793596, at \*12 (S.D.N.Y. Mar. 26, 2008) ("Courts in this district have repeatedly held that the need to walk slowly and the inability to walk long distances or for long periods of time . . . do not constitute substantial limits on walking.").

    [154]    *See Watson*, 2008 WL 793596, at \*14 (avoiding excessive walking is not a substantial limitation); *Garvin v. Potter*, 367 F. Supp. 2d 548, 562 (S.D.N.Y. 2005) (finding no substantial limitation where plaintiff could not walk quickly or walk for over eight hours); *Rosa v. Brinks, Inc.*, 103 F. Supp. 2d 287, 290-91 (S.D.N.Y. 2000) (finding limitations on walking or sitting or standing for long periods of time to be insufficiently substantial).

    [155]    *See Colwell*, 158 F.3d at 643-44 (inability to engage in prolonged standing is not a substantial limitation); *Glozman v. Retail, Wholesale & Chain Store Food Emps. Union, Local 338*, 204 F. Supp. 2d 615, 622 (S.D.N.Y. 2002) ("The inability to . . . stand for an extended duration does not amount to a substantial limitation on a major life activity.").

    [156]    *See, e.g.*, 8/2/02 Letter from Concourse Plaza Medical Complex, Ex. P-4 to De La Rosa Decl.; 9/13/02 Letter from Harvey Insler, M.D., Ex. P-6 to De La Rosa Decl.; 1/6/03 Letter from Harvey Insler, M.D., Ex. P-10 to De La Rosa Decl.; 6/20/03 Letter from Harvey Insler, M.D., Ex. P-17 to De La Rosa Decl.;

that her impairments caused chronic pain and affected her ability to walk or to

stand for a protracted time period.[157]  Further, she explained that alternating

between standing and sitting aggravated her condition.[158]  Medicine is ineffective

in relieving the pain.[159]  A doctor's report prepared after her termination from the

NYPD capped her ability to stand and walk at less than two hours in an eight-hour

---

2/4/04 Letter from Harvey Insler, M.D., Ex. P-23 to De La Rosa Decl.; 2/11/04 Letter; 3/1/04 Letter.

[157]   *See, e.g.*, De La Rosa Dep. at 194:15-23 ("Basically, I can't sit or stand.  Sitting is bad and then standing is bad so what am I supposed to do?  Even laying down is not that good. . . . Everything is bad.  If I had one thing like before when I just had back pain, at least I know like I could stand and relieve some of the back pain like my knee and I wouldn't feel pain in my legs.  Then I started feeling pain in my legs and then my neck."); *id.* at 203:4-13 ("I can't stand for a long time. I can't sit for a long time."); *id.* at 204:11-18 ("I can't go places that requires walking.")

[158]   *See, e.g.*, 1/28/10 Deposition of Ramona De La Rosa ("De La Rosa Dep. II"), Ex. D to Perry Decl., at 80:17-24 (responding that getting up and sitting down hurts her knees "if [she does] it all the time); De La Rosa Dep. at 138: 20-24 ("[I]f you are going to give me something that requires me to get up, sit down, get up and sit down, it is going to take a toll on my knees.").

[159]   *See, e.g.*, 1/28/10 Deposition of Ramona De La Rosa, Ex. 14 to De La Rosa Decl., at 89:2-6 ("I've been dealing with pain for so long, for so many years, I've grown to have some tolerance.  Plus, like I said before, you saw me take the medication.  It helps me with the pain but the medication does not take the pain away completely."); De La Rosa Dep. at 203:14-20 ("[The medication] helps but not really."); *id.* at 204:1-8, 19-25 ("[The symptoms are] basically constant because I think if I don't take the medication or sometimes I spend a long time without taking the medication and it starts burning.").

34

workday.[160]

De La Rosa's testimony and medical documentation does not clearly describe the extent to which her ability to walk and to stand are substantially limited by her back and knee problems.  Viewed in the light most favorable to De La Rosa, and considering her pro se status, I cannot conclude that she is not disabled within the meaning of the ADA.  The question of whether De La Rosa's herniated disks and osteoarthritis substantially limit her ability to walk and to stand raises a disputed issue of material fact.

**D.     Failure to Accommodate**

Although I cannot conclude that De La Rosa is not disabled under the ADA, she fails to establish a prima facie case of failure to accommodate her disability because she cannot identify a requested accommodation denied by the NYPD.  As her first request is time-barred, De La Rosa's remaining claims are that Defendants failed to accommodate her second request for a chair with lumbar support[161] and her third request to remain stationary during the work day.[162]

It is undisputed that the NYPD provided De La Rosa with the

---

[160]     *See* 7/18/05 Social Security Administration Medical Source Statement of Ability to do Work-Related Activities (Physical), Ex. G to Perry Decl., at 1.

[161]     *See* Second Request at 1.

[162]     *See* Third Request.

requested chair on January 28, 2004, although she did not have it when she returned from medical leave in December 2003.[163] To prevail on the claim that the Defendants failed to accommodate her request in a timely manner, De La Rosa must prove that the delay was motivated by discriminatory intent.[164] De La Rosa does not offer any evidence to support that the delay was motivated by such an intent.

It is also undisputed that the NYPD responded to De La Rosa's third request by allowing her to remain stationary at her desk for the first six hours of the day and requiring her to perform tasks requiring walking and standing only in the last two hours of her tour.[165] De La Rosa's deposition testimony confirms that even the end of her day was not spent walking or standing continuously.[166]

De La Rosa's 56.1 statement alleges an additional eighteen instances of the NYPD's failure to accommodate her disability:

> 1) Failure to provide accommodations at first assignment Midtown North, 2) [F]ailure to allow plaintiff to return to work

---

[163]    See id. at 2.

[164]    See Lyman v. City of New York, No. 01 Civ. 3789, 2003 WL 22171518, at *6 (S.D.N.Y. Sept. 19, 2003).

[165]    See 3/29/04 Memorandum; 3/29/04 Letter.

[166]    See De La Rosa Dep. II at 80:10-19 ("It wasn't the whole two hours, like walking two hours and not sitting down.").

36

with physical limitations on two (2) written notices, 3) Failure to abide by plaintiffs first request to not be place at residential precinct the 44th for safety concerns 4) Failure to realize that the 44th precinct require taking two public busses and walking three blocks everyday causing pain in knees and back 5) Failure to provide the granted request of a chair with lumbar support at the 44th precinct on plaintiffs return to duty on December 15, 2004. [sic]  6) Failure to continue to not provide chair and having plaintiff sit on hard uncomfortable chair, during Plaintiff's stay at the 44th precinct and when plaintiff left to work at Transit District 11 on January 8, 2004 no chair was granted 7) Failure to provide chair at Transit District 11 until January 28, 2004 while they had plaintiff in charge of Roll Call 8) Failure to provide original request of not being place in a precinct that require extensive walking or standing, Transit District 11 gave me assignment requiring walking. [sic] and standing 9) Failure to provide assignment that does not require walking or standing for long periods of time throughout the tour 10) Failure to provide flextime schedule the same as the other members at the precinct 11) Failure to provide a computer at plaintiffs desk so that she can complete her task relating to her assignment on a timely manner and avoid having to stand on her feet to complete assignments dealing with making copies while standing or filing documents in folders that require bending 12) Failure to provide a stationary assignment where plaintiff is sitting 90% of the time 13) Failure to provide accommodations request to remain stationary for over 3 weeks until the accident occur that caused injuries due to weak knees from extensive walking throughout the tour 14)  Failure to abide by partial accommodations for plaintiff to remain stationary for 5 hours in the early part of her tour unless there is an exigent circumstance requiring assistance 15)Failure [sic] to provide adequate accommodations that would avoid pain and suffering from walking, standing, sitting in hard chairs 16) Failure to provide chair that is not misuse by other members and is for the plaintiffs use only to alleviate any pain while sitting 17)Failure [sic] to enforce any granted accommodations 18) Failure to provide remedy to hostile work environment that cause further

37

health complications.[167]

These additional allegations largely overlap with previously-discussed accommodation claims. The second, third, fourth, eighth, and ninth examples relate to plaintiff's first, time-barred request for an accommodation involving an assignment where she would not have to stand for long periods of time or climb stairs.[168] While De La Rosa was on medical leave, she and the OEEO negotiated this accommodation, which was finalized in July 2003.[169] Similarly, the first instance alleged in the 56.1 statement concerns a September 22, 2002 request to be transferred from Midtown North,[170] which is also time-barred for falling beyond the 300-day statute of limitations.

The fifth, sixth, seventh, fifteenth, and sixteenth allegations relate to her second request for the chair with lumbar support. It is undisputed that Defendants provided De La Rosa this accommodation. The eleventh, twelfth, thirteenth, and fourteenth instances relate to her third request to remain stationary.

---

[167]    Pl. 56.1 ¶ 125.

[168]    *See* First Request at 1.

[169]    *See* 7/8/03 Letter.

[170]    *See* 9/22/02 Memorandum from Ramona De La Rosa to Commanding Officer, Midtown North Precinct re Transfer from Command for Medical Reasons, Ex. P-7 to De La Rosa Decl.

38

That Defendants provided this accommodation is also undisputed. While
Defendants had to provide De La Rosa with a reasonable accommodation for her
disability, they were not required to provide her with the accommodation of her
choosing.[171] De La Rosa's daily work schedule was arranged so that she could
remain stationary for at least 75% of her tour, allowing her to perform essential job
tasks requiring walking or standing only at the end of the day. "An employer is not
required to accommodate a disabled employee by eliminating one of the essential
functions of the job."[172]

Regarding the seventeenth allegation that Defendants failed to enforce
the granted accommodations, Defendants provided De La Rosa with the requested
chair and rearranged her work schedule, enabling her to remain seated for most of
her tour. De La Rosa even admitted that she was stationary for at least part of the
last two hours of her shift.[173] In short, De La Rosa points to nothing in the record
showing that Defendants failed to enforce the accommodations she received.

Only the tenth and eighteenth allegations are not duplicative or time-

---

[171]   See EEOC v. Yellow Freight Sys., Inc., No. 98 Civ. 2270, 2002 WL
31011859, at *21 (S.D.N.Y. Sept. 9, 2002) ("[U]nder the ADA an employee has no
right to any particular accommodation, but merely to a reasonable accommodation
. . . .").

[172]   Misek-Falkoff, 854 F. Supp. at 228.

[173]   See De La Rosa Dep. II at 80:10-19.

barred. Neither are meritorious. As to the tenth new instance of failure to accommodate, De La Rosa alleges that Defendants failed to provide her with Flextime. De La Rosa initially was part of the program but lost its privileges due to chronic lateness.[174] Further, Defendants' accommodations to her work schedule to allow her to remain stationary also changed her start time to account for the loss of Flextime.[175]

Last, as detailed below, De La Rosa's claims regarding a hostile work environment fail; accordingly, her eighteenth allegation that Defendants did not remedy the environment cannot support a claim.

## C.   Disability Discrimination

Although I cannot conclude that De La Rosa is not disabled under the ADA, she fails to establish a prima facie case of discrimination because she cannot show a causal link between the adverse employment actions and her disability. Specifically, De La Rosa alleges that Defendants discriminated against her by (a) removing her from the Flextime program;[176] (b) disciplining her for being

---

[174]   *See* 3/2/04 Memorandum; 5/19/04 Termination Recommendation.

[175]   *See* 3/29/04 Memorandum; 3/29/04 Letter.

[176]   *See* 3/2/04 Memorandum.

40

AWOL;[177] (c) placing her in the Performance Monitoring program;[178] (d) denying her a sick day when another PAA was granted the same day off;[179] (e) suspending her;[180] and (f) terminating her employment.[181]

Defendants argue that De La Rosa fails to establish a prima facie case of disability discrimination because the alleged adverse employment actions did not occur as a result of her disability.[182] They insist that only De La Rosa's conclusory allegations support her causation argument.[183] To defeat a motion for summary judgment, De La Rosa must rely on more than mere speculation.[184] Indeed, De La Rosa's unsubstantiated allegations that her disability caused the six allegations of discriminatory behavior is not supported by the record and is

---

[177]    *See* 3/19/04 Report; 4/23/04 Memorandum.

[178]    *See* 4/15/04 Performance Monitoring at NYPD 00481-82; 7/9/04 Performance Monitoring at NYPD00456-57.

[179]    *See* De La Rosa Dep. at 152:14-154:12l; 5/20/04 Letter; 5/21/04 Memorandum ¶ 1.

[180]    *See* 6/9/04 Suspension Report.

[181]    *See* 7/21/04 Notice.

[182]    *See* Def. Mem. at 13-18.  For the purposes of the motion, Defendants assume that De La Rosa could establish that these instances were materially adverse changes to her working conditions. *See id.* at 14.

[183]    *See id.* at 14-18.

[184]    *See Jeffreys*, 426 F.3d at 554.

insufficient to allow an inference of discrimination.[185]

Defendants further argue that they have legitimate reasons for their actions, and De La Rosa cannot show that they intentionally discriminated against her.[186] The record here shows that Defendants' stated reasons for disciplining and eventually terminating De La Rosa legitimately relate to her work performance.

*First*, the NYPD withdrew De La Rosa's Flextime privileges because of her chronic tardiness.[187] Even De La Rosa admitted that she signed into work later than Flextime allowed before she lost the privilege.[188]

*Second*, the record shows that De La Rosa's refusal to report for work on March 19 caused her to receive a Command Discipline for being AWOL.[189]

*Third,* with regard to the sick day she was not allowed to take, De La Rosa herself explained that the lack of staff at TD-11 that day made her attendance

--------

[185]     *See Hawana v. City of New York*, 230 F. Supp. 2d 518, 528 (S.D.N.Y. 2002).

[186]     *See* Def. Mem. at 18.

[187]     *See* 3/2/04 Memorandum; 5/19/04 Termination Recommendation. Santiago later clarified that De La Rosa reported to work later than Flextime allowed. *See* 9/1/04 Report at NYPD00742.

[188]     *See* De La Rosa Dep. II at 87:22-25.

[189]     *See* 3/19/04 Diary Entry; 3/19/04 Report; 4/23/04 Memorandum; 5/19/04 Termination Recommendation.

42

necessary.[190]

　　　　*Fourth,* the record also establishes that the NYPD placed De La Rosa in the Performance Monitoring program twice because of her "poor performance, excessive absenteeism and/or tardiness, misconduct or below standard evaluation."[191]

　　　　*Fifth,* her suspension resulted directly from her refusal to follow an order of a superior officer and resulting verbal altercation.[192]   Although De La Rosa explains that she refused to perform the order because of the accommodation allowing her to remain stationary in the mornings, her suspension actually resulted from her insubordination and attitude towards Lieutenant Morillo.[193]

　　　　*Sixth*, her termination resulted from her below standards performance, poor disciplinary record, and problems with absenteeism and lateness, all extensively documented by written performance evaluations and requests for disciplinary action.[194]

---

[190]　　*See* De La Rosa Dep. at 152:23-153:8.

[191]　　4/15/04 Performance Monitoring; 7/9/04 Performance Monitoring.

[192]　　*See* 6/9/04 Suspension Report.

[193]　　*See id.* at 2 ("[S]he was suspended as of 1621 hours for insubordination and being discourteous to a supervisor.").

[194]　　*See, e.g.*, 3/9/04 Report of Violation; 3/10/04 Performance Evaluation; 4/15/04 Performance Monitoring; 4/16/04 Report of Violation; 4/22/04 Early

### D.    Retaliation

As retaliation, De La Rosa alleges the same six instances as the

disability discrimination claim.  She also asserts that Defendants retaliated against

her by (a) failing to accommodate her disability;[195] (b) evaluating her employment

performance negatively;[196] (c) the varied nature of her assignments at TD-11;[197] (d)

name calling and derogatory remarks;[198] (e) use of her chair by other employees;[199]

(f) negative attitudes towards her;[200] (g) the design of her work space.[201]

Regarding examples (c) through (g), Defendants argue that a

reasonable employee would not have found these actions materially adverse.[202]

---

Arrival Memorandum; 5/8/04 Report of Violation; 5/17/04 Performance
Evaluation; 5/19/04 Termination Recommendation; 6/5/04 Report of Violation;
7/9/04 Performance Monitoring.

[195]    *See* De La Rosa Dep. at 113:10-16, 114:11-14.

[196]    *See* 3/10/04 Evaluation at NYPD 00516, 518, 520-22; 5/17/04
Evaluation NYPD00503, 505-08.

[197]    *See* De La Rosa Dep. at 113:17-114:11; 119:9-119:18.

[198]    *See id.* at 116:16-118:3.

[199]    *See id.* at 121:10-25.

[200]    *See id.* at 125:2-22.

[201]    *See* 3/6/04 Letter at 1-2; 4/13/04 Complaint of Employment
Discrimination, Ex. P-66 to De La Rosa Decl.

[202]    *See* Def. Mem. at 20.

The standard is that of a reasonable person.[203]  "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."[204]  De La Rosa's examples (c) through (g) fail here.  Specifically, a reasonable person would not find the varied nature of her assignments, use of her chair by other employees, negative attitudes, or office design to change materially the terms and conditions of employment.  As for the allegations of name calling and derogatory remarks, such comments also do not constitute an adverse change in employment.[205]  "While verbal abuse might at times be sufficiently severe and chronic to constitute an adverse employment action, such behavior, without more, hardly rises to the level of actionable retaliation."[206]

For the remaining examples, Defendants argue that De La Rosa

---

[203]    *See Flynn*, 620 F. Supp. 2d at 490.

[204]    *Id.* (quoting *Burlington N. & Sante Fe R.R. Co. v. White*, 548 U.S. 53, 64 (2006)).

[205]    *See Alvarez v. Nicholson*, No. 03 Civ. 4173, 2005 WL 1844595, at *7 (S.D.N.Y. Aug. 3, 2005); *Brennan v. City of White Plains*, 67 F. Supp. 2d 362, 374 (S.D.N.Y. 1999); *Pomillo v. Wachtell, Lipton, Rosen & Katz*, No. 97 Civ. 2230, 1999 WL 9843, at *8 (S.D.N.Y. Jan. 11, 1999).

[206]    *Brennan*, 67 F. Supp. 2d at 374.

cannot establish a causal connection between her protected activities and any adverse employment action.[207]  Defendants further insist that they have legitimate non-retaliatory reasons for their actions.[208]  Assuming that the other instances of alleged retaliatory activity did materially affect her employment, De La Rosa offers no evidence save speculation that Defendants retaliated against her for requesting accommodations and complaining to OEEO by disciplining her and terminating her employment.  These instances overlap with the discrimination claim, where Defendants have already offered legitimate justifications for their actions, and De La Rosa did not identify any evidence tending to show that these reasons are pretextual.

As for her two remaining allegations, examples (a) and (b), De La Rosa has not identified any accommodation she was not provided.  Finally, her negative performance evaluations directly resulted from her negative work performance.  De La Rosa suggests that the timing of her first evaluation—shortly after her last request for reasonable accommodation—shows that it is the result of an improper motive.[209]  Still, De La Rosa offers no evidence save speculation that

---

[207]   *See* Def. Mem. at 19.

[208]   *See id.* at 20.

[209]   *See* 3/6/04 Letter at 2.

she received a negative performance evaluation because of her request for accommodation, and Defendants maintain that her poor performance justified her poor review. The timing of De La Rosa's performance evaluation is a question within the professional judgment of her supervisors. Courts may not "second-guess an employer's non-discriminatory business decisions, regardless of their wisdom."[210]   Accordingly, De La Rosa fails to allege an instance where Defendants retaliated against her for engaging in a protected activity.

### E.   Hostile Work Environment

De La Rosa's hostile work claims largely overlap with earlier allegations. As in the discrimination and retaliation claims, De La Rosa also alleges that Defendants created a hostile work environment by (a) removing her from the Flextime program;[211] (b) disciplining her for being AWOL;[212] (c) denying her a sick day when another PAA was granted the same day off;[213] and (d) suspending her.[214] Overlapping with her other retaliation claims, she also alleges

---

[210]   *Williams v. NYC Dep't of Sanitation*, No. 00 Civ. 7371, 2001 WL 1154627, at *18 (S.D.N.Y. Sept. 28, 2001).

[211]   *See* 3/2/04 Memorandum.

[212]   *See* 3/19/04 Report; 4/23/04 Memorandum.

[213]   *See* De La Rosa Dep. at 152:14-154:12l; 5/20/04 Letter; 5/21/04 Memorandum ¶ 1.

[214]   *See* 6/9/04 Suspension Report.

47

that the following instances created a hostile work environment: (e) name calling and derogatory remarks;[215] (f) the nature of her assignments at TD-11;[216] (g) evaluating her employment performance negatively;[217] and (h) negative attitudes towards her.[218]   Finally, De La Rosa alleges that other discrete instances created a hostile work environment: (i) threats of a Command Discipline;[219] (j) damage to chair, desk, and ID card;[220] (k) use of a microphone to call her name while on a break;[221] (l) inability to eat lunch at her desks;[222] (m) left out of a coworker's retirement party;[223] and (n) dim lighting.[224]   Generally, Defendants argue that De La Rosa cannot establish that the workplace was hostile or abusive because the

---

[215]   *See* De La Rosa Dep. at 129:2-130:20, 146:19-22.

[216]   *See id.* at 138:10-24; 4/22/04 Memorandum from Ramona De La Rosa to Administrative Lieutenant re Work Assignment and Accommodations, Ex. P-68 to De La Rosa Decl., ¶ 1.

[217]   *See* De La Rosa Dep. at 148:18-20; 4/22/04 Memorandum ¶ 7.

[218]   *See* De La Rosa Dep. at 172:14-173:22.

[219]   *See id.* at 144:7-20.

[220]   *See id.* at 145:4-146:18, 148:2-12, 192:15-16; 4/22/04 Memorandum ¶ 2.

[221]   *See* Compl. ¶¶ 58-59.

[222]   *See* De La Rosa Dep. at 170:16-172:11; 4/22/04 Memorandum ¶ 3.

[223]   *See* De La Rosa Dep. at 169:20-170:15.

[224]   *See id.* at 173:23-174:10.

48

instances she points to are not severe or pervasive.[225]

   De La Rosa's hostile work environment claim cannot be sustained because she has not shown a pattern of severe harassment, such that the conditions of her employment were effectively altered.  De La Rosa cites fourteen separate examples of behavior she asserts made TD-11 a hostile work environment.  Even viewed cumulatively, these examples are not "offensive, pervasive, or continuous enough to amount to a constructive discharge."[226]  Indeed, many of the examples are discrete instances.  For example, Defendants removed De La Rosa from Flextime once, disciplined her for being AWOL once, denied her a sick day once, suspended her once, and reviewed her performance negatively twice.  The other discrete examples, (f) and (h)-(n), are vague and not objectively hostile viewed under a reasonable person standard.  Regarding her allegation of name calling and derogatory remarks, there is no evidence that TD-11 was permeated with "frequent, severe and offensive disability-related comments" to meet the demanding standard of a hostile work environment claim.[227]

## V. CONCLUSION

---

[225] *See* Def. Mem. at 22-23.

[226] *Scott*, 190 F. Supp. 2d at 599.

[227] *Monterroso*, 591 F. Supp. 2d at 585.

For the foregoing reasons, Defendants' motion is granted.  The Clerk of the Court is directed to close this motion (docket #34) and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            October 22, 2010

50

**- Appearances -**

**Plaintiff (Pro Se):**

Ramona De La Rosa
1065 University #7A
Bronx, New York 10452
(718) 293-8278

**Counsel For Defendants**:

Devor Deland Perry
Assistant Corporation Counsel
Corporation Counsel of the City of New York
100 Church Street, Room 2-188
New York, New York10007
(212) 788-0917

51